**KRANJAC TRIPODI & PARTNERS LLP**
Xavier M. Bailliard
James Van Splinter
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (646) 216-2400
Fax: (646) 216-2373
xbailliard@ktpllp.com
jvansplinter.ktpllp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SANTOSH SINGH, SANDALWOOD HOLDINGS, LLC, and LINCOLN AT GREGORY LLC, | Civil Action No. |
| Plaintiffs, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| TOWNSHIP OF WEEHAWKEN, MAYOR RICHARD F. TURNER, in his Official and Individual Capacities, FRANK TATTOLI, in his Official and Individual Capacities, GIOVANNI D. AHMAD, in his Official and Individual Capacities, RICHARD P. VENINO, in his Official and Individual Capacities, JOSEPH R. VENEZIA, P.E., P.P., C.M.E., COLLIERS ENGINEERING & DESIGN, INC., NEJM JUNDI, P.E., and JZN ENGINEERING, PC, | |
| Defendants. | |

Plaintiffs Santosh Singh, Sandalwood Holdings, LLC, and Lincoln at Gregory LLC, by and through their attorneys, Kranjac Tripodi & Partners LLP, by way of Complaint against defendants Township of Weehawken, Mayor Richard F. Turner, Frank Tattoli, Giovanni D.

Ahmad, Richard P. Venino, Joseph R. Venezia, P.E., P.P., C.M.E., Colliers Engineering & Design, Inc., Nejm Jundi, P.E., and JZN Engineering, PC, hereby allege as follows:

## INTRODUCTION

1.     Plaintiffs Santosh Singh ("Singh"), Sandalwood Holdings, LLC ("Sandalwood"), and Lincoln at Gregory LLC (collectively, "Plaintiffs") bring this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Federal Racketeer Influenced and Corrupt Organizations Act, (18 U.S.C. § 1961, *et seq.*), and the New Jersey Racketeer Influenced and Corrupt Organizations Act, (N.J.S.A. 2C:41-1, *et seq.*), as a result of the shocking abusive acts of the Township of Weehawken and certain of its officials and employees, who, at the direction of Mayor Richard F. Turner, and under color of law, in retaliation for having filed a lawsuit in this Court under Docket No. 15-cv-03478 (the "First Lawsuit"), and in furtherance of a collective and coordinated scheme to harass, intimidate, retaliate against, and extort Plaintiffs (1) in connection with having filed, testified, and intending to testify at trial in the First Lawsuit against the Township of Weehawken and Weehawken officials, and (2) to continue to provide housing for a politically favored resident, the Defendants used the occurrence of a storm to, without any prior notice and without any factual or legal basis, (i) first kick Singh—an elderly citizen—out of her home (with only limited personal belongings), and (ii) then condemn and order the immediate demolition of Singh's home and an adjoining property she also owns.   It was only after Singh was able to retain, at her own expense, an expert to inspect her home and demonstrate that the Defendants had no basis to order the condemnation and demolition of her home (and thus did so as retaliation) that the Defendants (led by Mayor Turner) were forced to abandon their position and allow Singh and her tenants to return to their homes.   If Singh had not been able to retain her own expert to demonstrate that the

Defendants actions were completely arbitrary and without any basis, her home and adjoining property would currently be demolished, and she would be homeless.

2.      More, to make matters worse, despite being faced with uncontroverted evidence that the orders directing that Singh's home be immediately demolished were baseless, the Defendants have refused, without any basis, to vacate the orders, all in an effort to further harass and intimidate Plaintiffs.

3.      As a result of the Defendants' actions and refusal to vacate the orders, Defendants have effectively taken control of Plaintiffs' properties and rendered them worthless.  Indeed, with the vacate and demolition orders in effect, Plaintiffs cannot sell, refinance, renovate, or do anything with their properties.  These acts were all directed at Plaintiffs to ruin them financially and to drive Plaintiffs out of Weehawken.

4.      Through this and other shocking abuse of power set forth in detail below, the Defendants knowingly and deliberately deprived Plaintiffs of their constitutional rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution, and committed numerous violations of the Federal and New Jersey RICO statutes, for which Plaintiffs now seek redress.

## PARTIES

5.      Plaintiff Singh is an individual who resides in Weehawken, New Jersey.   Singh is a seventy-eight-year-old immigrant from India and a citizen of the United States.

6.      Plaintiff Sandalwood Holdings Limited Liability Company is a New Jersey limited liability company with an address of 2 Lincoln Place, Weehawken New Jersey.  The members of Sandalwood Holdings Limited Liability Company are The Santosh Singh 2012 Family Trust and The Virendra Singh 2012 Family Trust.  The Santosh Singh 2012 Family Trust and The Virendra

3

Singh 2012 Family Trust are New Jersey trusts with principal places of administration in New Jersey.

7.     Plaintiff Lincoln at Gregory LLC owns 4 Lincoln Place, Weehawken New Jersey. The sole member of Lincoln at Gregory LLC is Sandalwood Holdings Limited Liability Company.

8.     Defendant Township of Weehawken ("Weehawken") is a municipality organized under New Jersey law.

9.     Defendant Mayor Richard F. Turner is an individual who, upon information and belief, resides in New Jersey.  Mayor Turner is and was at all times relevant herein the elected Mayor of Weehawken.  In such capacity, Mayor Turner is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Mayor Turner was acting under color of law.  Mayor Turner is sued in his official and individual capacities.

10.     Defendant Frank Tattoli ("Tattoli") is an individual who, upon information and belief, resides in New Jersey.  Tattoli is and was at all times relevant herein the Construction Official of Weehawken.   In such capacity, Tattoli is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Tattoli was acting under color of law.  Tattoli is sued in his official and individual capacities.

11.     Defendant Giovanni D. Ahmad ("Ahmad") is an individual who, upon information and belief, resides in New Jersey.  Ahmad is the Township Manager of Weehawken.  In such capacity, Ahmad is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Ahmad was acting under color of law.  Ahmad is sued in his official and individual capacities.

4

12.     Defendant Richard P. Venino ("Venino") is an individual who, upon information and belief, resides in New Jersey.  Venino is and was at all times relevant herein the Law Director of Weehawken.  In such capacity, Venino is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Venino was acting under color of law.  Venino is sued in his official and individual capacities.

13.     Defendants Mayor Turner, Ahmad, Tattoli, and Venino are referred to collectively as the "Weehawken Co-Conspirator Defendants."

14.     Defendant Joseph R. Venezia, P.E., P.P., C.M.E. ("Venezia") is an individual who, upon information and belief, resides in New Jersey.  Venezia is and was at all times herein the Township Engineer of Weehawken.

15.     Defendant Colliers Engineering & Design, Inc. ("Colliers Engineering") is a New Jersey corporation with its principal place of business located at 331 Newman Springs Road, Red Bank, New Jersey.

16.     Defendant Nejm E. Jundi, P.E. ("Jundi") is an individual who, upon information and belief, resides in New Jersey.

17.     Defendant JZN Engineering, P.C. ("JZN") is a New Jersey corporation with its principal place of business located at 99 Morris Avenue, Springfield, New Jersey.

18.     Defendants Venezia, Colliers Engineering, Jundi, and JZN are referred to collectively as the "Engineer Co-Conspirator Defendants."

## JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Counts One through Seven of the Complaint arise under 42

U.S.C. § 1983 and 42 U.S.C. § 1985 and because Counts Nine and Ten arise under 18 U.S.C. § 1961, *et seq*.

20.     The Court has supplemental jurisdiction over the state law claims of the Complaint pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form the same case or controversy.

21.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because all of the Co-Conspirator Defendants are subject to personal jurisdiction in the District of New Jersey and because a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

## FACTUAL ALLEGATIONS

## I.     SINGH FILES A FIRST LAWSUIT AGAINST WEEHAWKEN AND THE WEEHAWKEN CO-CONSPIRATOR DEFENDANTS IN 2015

22.     In 2015, Plaintiffs filed the First Lawsuit against, among others, Weehawken, Mayor Turner, Ahmad, Tattoli, and Venino.

23.     In the First Lawsuit, Plaintiffs asserted RICO and due process claims against Weehawken, Mayor Turner, Ahmad, Tattoli, and Venino in connection with actions they had engaged in subsequent to Hurricane Sandy, which hit Hudson County, including Weehawken, in late 2012.

24.     Specifically, Plaintiffs alleged that Weehawken, Mayor Turner, Ahmad, Tattoli, and Venino engaged in a coordinated pattern of intimidation and extortion in order to force Singh into providing essentially free housing (at a rate of $163/month) for politically favored individuals (the "Politically Favored Individuals") in a brand new apartment since 2013 and through July 2023.

25.     As of September 2020, the Court had entered a Final Pretrial Order in the First Lawsuit.  Singh and her son had already testified in depositions and intended to testify at trial in the matter, which was ready for trial.

## II.     IN 2021, DURING THE PENDENCY OF THE FIRST LAWSUIT, WEEHAWKEN IS HIT BY HURRICANE IDA, WHICH CAUSES SEVERAL MUDSLIDES IN WEEHAWKEN.

26.     In late 2021, another major storm hit Hudson County, including Weehawken – Hurricane Ida.

27.     At the time, that Politically Favored Individuals continued to live in the new apartment.  While they had made some monthly payments of $163, they had failed to make numerous payments and were essentially living rent free.

28.     Hurricane Ida caused some damage, but on an infinitely smaller scale than Hurricane Sandy.

29.     For example, although Hurricane Sandy caused damage to many buildings in Weehawken, Hurricane Ida did not.  And importantly, Hurricane Ida caused zero damage to two of Plaintiffs' properties, 2 Lincoln Place and 4 Lincoln Place in Weehawken.

30.     As set forth above, 2 Lincoln Place is Singh's home, where she has lived since 2006, which has a detached garage.

31.     4 Lincoln Place is a three-unit property adjoining 2 Lincoln Place that is owned by Plaintiffs and rented to tenants.

32.     The Weehawken Co-Conspirator Defendants know all of this.

33.     Regardless, Weehawken and the Weehawken Co-Conspirator Defendants, with the help of the Engineer Co-Conspirator Defendants, decided to use the occurrence of Hurricane Ida to harass, retaliate against, and extort Plaintiffs in connection with having filed, testified, and

intending to testify at trial in the First Lawsuit (which was ready to be tried) and to force Plaintiffs to continue to provide essentially free housing for the Politically Favored Individuals.

34.     Specifically, on or about September 1, 2021, Weehawken, was hit by a storm resulting from Hurricane Ida.

35.     During the storm, rain caused three mudslides along the Palisades Cliffs in Weehawken, which resulted in debris being swept onto Hackensack Plank Road (also in Weehawken) at the bottom of the Palisades Cliffs.

36.     One of the mudslides occurred on a section of the Palisades Cliffs that was located, in part, hundreds of feet below Singh's residence at 2 Lincoln Place (which directly overlooks the Palisades Cliffs).

37.     Although 2 Lincoln Place and the adjoining property, 4 Lincoln Place, suffered no damage from the storm, the Weehawken Co-Conspirators (with the assistance of the Engineer Co-Conspirator Defendants) decided to use the occurrence of the mudslide to engage in a coordinated scheme to further harass, retaliate against, and extort Plaintiffs – by (i) kicking Plaintiffs out the properties and ordering their demolition on the purported grounds that the properties had somehow been rendered structurally unsound as a result of the storm, and (ii) refusing to vacate demolition orders, which are still in effect, which has resulted in a dramatic diminution of Plaintiffs' properties' value and use.  As set forth below, the properties were not rendered (and presently are not) structurally unsound, and there existed zero evidence supporting any finding by the Weehawken Co-Conspirator Defendants or the Engineer Co-Conspirator Defendants otherwise.

III.    **DEFENDANTS ENGAGE IN A COORDINATED SCHEME TO FABRICATE FINDINGS THAT PLAINTIFFS' PROPERTIES ARE STRUCTURALLY UNSOUND AND THUS MUST BE IMMEDIATELY DEMOLISHED.**

38.    Shortly after Hurricane Ida passed, the Weehawken Co-Conspirator Defendants retained the Engineer Co-Conspirator Defendants to inspect several properties that were located above where the various mudslides occurred, including Singh's property at 2 Lincoln Place.

39.    On or about September 2, 2021, the Engineer Co-Conspirator Defendants, with Tattoli, performed an inspection of 2 Lincoln Place.  They did not inspect 4 Lincoln Place.

40.    However, Tattoli and the Engineer Co-Conspirator Defendants did not actually physically inspect 2 Lincoln Place.  Instead, they simply went to a location on Hackensack Plank Road that was hundreds of feet below 2 Lincoln Place and made findings based on a cursory observation by simply looking up towards the 2 Lincoln Property.

41.    During said purported visual inspection, Tattoli and the Engineer Co-Conspirator Defendants purportedly saw—again, from hundreds of feet away—what they believed was some "cracking" on the side of 2 Lincoln Place and on the garage next to the property (which is not attached to the property).   Naturally, since they viewed this cracking from hundreds of feet away, they necessarily could not accurately assess the cause, extent, and severity of said cracking, or whether it presented any danger to the structural stability of the properties. They also could not tell if the cracking had been caused by the storm or had been there for years prior (which it had).

42.    Both engineers, Venezia and Jundi, would later issue formal reports in which they admitted all of this, including that the inspection was made from hundreds of feet away.

43.    More, Tattoli would later admit that he knew the cracking previously existed, and stated only that they "appeared to have increased."  However, no proof that the cracks increased was ever provided, because they had not.

44.     Despite knowing that their inspection was insufficient to come to any conclusion as to the structural soundness of the properties, Tattoli and the Engineer Co-Conspirator Defendants nonetheless decided to use their observation of said purported cracking on Plaintiffs' property at 2 Lincoln as a pretext to kick Singh out of 2 Lincoln Place and order its immediate demolition.  And, although they had not inspected 4 Lincoln Place, and had thus not seen any cracks or other damage to that property, they also kicked the tenants out of 4 Lincoln Place and ordered its demolition as well.

45.     Indeed, on September 5, 2021, the Weehawken Co-Conspirator Defendants, using the Engineer Co-Conspirators' baseless findings, posted notices (the "Vacate Orders") at 2 Lincoln Place and 4 Lincoln Place stating that the properties were "unsafe" and ordering Singh and her tenants to immediately vacate the properties.

46.     That same day, Tattoli  emailed Singh a memorandum entitled "Emergency Vacate Order" in which Tattoli stated that during an inspection of the damage caused by the mudslide below 2 Lincoln Place, he and the Engineer Co-Conspirator Defendants purportedly discovered the existence of "very serious" "cracks" on 2 Lincoln Place and its adjoining garage (which is not attached to 2 Lincoln Place).  Based on the discovery of these purported cracks, Tattoli found that there was an "imminent danger of failure or collapse . . . which would endanger life" and ordered everyone in the two properties to immediately vacate.

47.     Again, Tattoli and the Engineer Co-Conspirator Defendants knew that the Vacate Orders and Emergency Vacate Order were baseless, but, nonetheless, issued them knowing that Singh—who he knew was seventy-six and physically impaired—would be forced out of the home where she had lived in for decades (for most of the time with her husband who had recently passed away, which Defendants also knew) and rendered homeless.

48.     Finally, not coincidentally, only 2 Lincoln and 4 Lincoln were deemed unsafe and ordered to be vacated by the Weehawken Co-Conspirator Defendants and the Engineer Co-Conspirator Defendants.  No other properties on the same street were deemed unsafe including those attached to 2 Lincoln and 4 Lincoln.  And no properties located on Hackensack Plank Road (where the mudslide had occurred) were deemed unsafe.  In addition, 2 Lincoln Place is immediately adjacent to a public park for kids that also overlooks the Palisades Cliffs (and thus where the mudslide occurred); however, that park was deemed safe and remained open.

49.     Finally, none of the other properties that were located above where the two other mudslides occurred were deemed so unsafe to require the residents to vacate the properties, which included a property where the mudslide occurred directly under the property's deck (and not 50-100 feet below the property, like the mudslide that occurred below Singh's property).   More, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants made immediate efforts to secure the areas where the two other mudslides occurred; but, did not nothing to secure the area where the mudslide occurred below Singh's property.

50.     After receiving the Orders, Singh was forced out of her home, with little to no notice, and without the ability to properly pack personal belongings.  More, Weehawken made no effort to assist Singh in finding alternate housing, and essentially left her on the street and to her own devices, demonstrating an utter lack of concern for her well-being or safety, or the fact that they had kicked a senior citizen out of her home with zero valid factual or legal basis.

51.     After having been kicked out of her home, and without any other recourse, Singh was forced to hire a structural engineer, at her own expense, who inspected the properties on September 7, 2021.

52.     Singh's engineer had already inspected the properties' years prior and thus was able to review documentation and pictures from that prior inspection, which demonstrated that the cracks that Tattoli and the Engineer Co-Conspirator Defendants had seen, in fact, were, pre-existing form years prior and had not gotten worse.  These were the same cracks Tattoli and the Engineer Co-Conspirator Defendants claimed now posed an imminent risk of collapse.

53.     After completing a thorough on-site inspection (and not simply looking up from a distance, like Tattoli and the Engineer Co-Conspirator Defendants had done), the engineer concluded that the purported new cracks were not new and were superficial, and that there existed absolutely no danger to the structural integrity of the buildings.

54.     Naturally, the engineer further concluded that there existed nothing that would justify the Vacate Orders and Emergency Vacate Order.

55.     But the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants did not stop at kicking Singh out of her home and taking her rental profits from the rented units at 4 Lincoln (which was also now vacated).

56.     In or around September 8, 2021, Tattoli requested that Plaintiffs provide him with access to 2 Lincoln Place and 4 Lincoln Place to actually physically inspect the properties. Plaintiffs were agreeable to allowing access, but repeatedly requested that Weehawken provide a certificate of insurance prior to doing so.  Asking for a certificate of insurance is commonplace and a certificate is very easily obtainable by any insured, including Weehawken.  Plaintiffs also requested that they be provided with any notes or reports from the Engineer Co-Conspirator Defendants that supported their findings which formed the basis for the issuance Vacate Orders and Emergency Vacate Order.

57.     However, Weehawken refused to provide any certificate of insurance, and also did not provide any reports from the Engineer Co-Conspirator Defendants.

58.     Then, on September 10, 2021, Defendants followed their Vacate Orders and Emergency Vacate Order by sending Singh copies of a Notice of Unsafe Structure (the "Demolition Orders") for both 2 Lincoln Place and 4 Lincoln Place, ***which now ordered Singh to demolish her home and her adjoining property*** or correct the purported unsafe conditions (which Singh's engineer found did not exist) on or before September 16, 2021 – ***less than a week later***.

59.     In the span of a couple weeks, Singh had gone from living in her home without causing any trouble or being issued any violations in connection with her home, to being kicked out on the streets and told her home (in which she had lived for decades) would be bulldozed to the ground – all on the grounds that the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had purportedly noticed from afar cracks that had been there for years.

60.     More, despite issuing such drastic orders directing the demolition of Singh's properties, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants still did not bother to provide any engineer report, as would be customary when issuing an extraordinary order demanding the demolition of a property.  Instead, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants arbitrarily and improperly placed the burden on Singh (in an effort to further harass her) to hire her own engineer and attorney at her own expense to demonstrate that the properties were, in fact, safe.

61.     Yet more, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants did not issue any demolition order for any property other than the two properties owned by Plaintiffs, even though several other properties were located directly above the mudslides that had occurred or in their path.  This included the property located at 6 Lincoln,

which was attached to and shared a common wall with 4 Lincoln.  The reason why is simple – 6 Lincoln and the other properties are not owned by Plaintiffs.

62.     In fact, one of these other properties was located above a more severe mud slide and rock slide that caused a retaining wall to collapse; however, the property was not issued any notice to vacate or to be demolished.  Furthermore, protective measures were taken immediately to protect that property so no additional damage could occur.

63.     On September 14, 2021, Singh's son and a contractor travelled to 2 Lincoln Place in order to move out certain office papers and other personal belongings of Plaintiffs, since Singh had not been afforded the opportunity to do so when she had been abruptly kicked out of her home.

64.     In order to move the office supplies and paperwork, Singh's son parked a large van in the driveway of 2 Lincoln Place – which the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had deemed so unsafe it needed to be demolished.  However, although a representative of Weehawken's building department was present and took pictures and video of Singh's son's every move, the representative did not bother to ask Singh's son to move the van from the driveway and allowed it to remain parked there for hours – again, despite the fact that the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had ordered that the property was purportedly so unsafe and subject to immediate collapse that it needed to be demolished.

65.     Remarkably, the Weehawken official present at this event was Geoffrey Santini, the same official who signed the vacate notices posted on the doors of 2 Lincoln and 4 Lincoln.

66.     In addition, Mr. Santini made a noteworthy statement to Singh's son when Plaintiffs were finished loading the van and attempted to back out of the driveway.  Specifically, Mr. Santini and a police officer were blocking Plaintiffs from leaving the driveway, and when Singh's son

14

requested that they move, Mr. Santini stated: "Don't get mad at me, get mad at the mayor, I'm just a worker."

67.    This statement demonstrated that Mayor Turner directed and/or approved of the issuance of the orders and the effort to not only kick Singh out of her home, but destroy it.

68.    The Weehawken Co-Conspirator Defendants had previously harassed Singh in connection with properties she owned and rented.  They now had decided to unlawfully use their municipal powers to attack her personally, threaten her well-being, and take control of her home.

69.    On September 15, 2023, Singh, her son, and Singh's attorney met with Tattoli and a Township inspector at 2 Lincoln Place to discuss the orders and the properties' condition.

70.    Upon arriving, Tattoli and the Township inspector first noted that the driveway for 2 Lincoln Place was somehow in poor condition.  Singh and her attorney responded that the driveway had nothing to do with the orders – more, they explained that it had been in the same state for years.

71.    Tattoli thereafter asked about the cracking on the side of 2 Lincoln Place and the garage (which formed the basis for the orders), and Singh again explained that they had been there for years and had not been worsened during Hurricane Ida.

72.    Finally, in an effort to create a post hac basis for the Vacate and Demolition Orders since it had become clear that the cracks were pre-existing, Tattoli inquired about a small hole in the corner of the garage, which Singh explained yet again that it had been present for years and was not caused by Hurricane Ida.

73.    Each time Singh explained that the issues pointed out by Tattoli were pre-existing, Tattoli had no response, because he had no evidence that the issues had been caused by Hurricane Ida.

74.     However, despite being made aware of the pre-existing nature of the cracking, driveway, and hole in the garage, and thus that the bases for his orders were false, Tattoli nonetheless refused to vacate his prior orders, including the Demolitions Orders.

75.     As such, also on September 15, 2021, faced with the imminent destruction of her home and adjoining property (which were still furnished), Singh filed an appeal (the "Appeal") of the Demolition Orders with the Hudson County Construction Board of Appeals (the "Board"), and thereafter provided a copy of her engineer's report to the Board and to the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants.

76.     In addition, the same day, since the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had still failed to provide Singh with any engineer report to support the Vacate Orders and Demolition Orders, Singh was forced to serve the Weehawken Co-Conspirator Defendants with an OPRA request demanding production of the same.

77.     On September 16, 2021, Singh and her son again went to 2 Lincoln Place to meet with Singh's  engineer.  Upon their arrival, Weehawken Police Officer Vion (Badge #81) was loitering and trespassing on the porch of 4 Lincoln Place.  Singh's son and the engineer proceeded to walk around the property and subsequently entered 2 Lincoln Place and closed the entrance door to the home and the entrance door to the apartment.  Without any permission or even knocking, let alone any probable cause, Officer Vion entered Singh's home, through two closed doors – thus breaking and entering into the home.

78.     When Singh's son confronted Officer Vion as to whether he had a warrant to be on the property, Officer Vion admitted he did not, but had entered Singh's home because he did not know who Singh's son or the engineer were.  Obviously, this was far from a valid legal reason that would allow Officer Vion to enter into Singh's home without permission.

79.     Officer Vion then left the premises, but later returned and entered the property again without notice, at which time he admitted that he had been instructed by his supervising officer to follow Singh's son and her engineer into the property (despite having no consent or warrant to do so).   Singh (or her son) now could not even enter her own home without having a Township official follow them inside.

80.     The Weehawken Co-Conspirator Defendants, who had already kicked Singh out of her home and ordered its demolition, had now essentially taken control of the property; thus, eviscerating any privacy and/or legal rights Singh had to be free from unconstitutional governmental interference therein.

81.     This incident was communicated to the Weehawken Co-Conspirator Defendants orchestrating this harassment, to which Venino, in an email to Plaintiffs' attorney, responded, in part:

> [O]ur Police are aware that the properties are not currently permitted to be occupied. We understand that the owner and tenants sometimes need access to remove items. However, not each of our Police Officers necessarily knows who the owners are or will recognize them.  Also, your clients may have engineers or other experts inspecting the properties. Therefore, if our Police see someone at the properties, they may ask who they are. We would hope that the response would be cooperative.  But that has not always been the case. Ideally, we would like advance notice when anyone plans to access the properties. For the safety of everyone involved, that would be best.  We also understand that may not always happen.

82.     As set forth above, Plaintiffs' properties now were effectively being controlled by the Weehawken Co-Conspirator Defendants.

83.     More, as set forth below, Singh was never afforded the opportunity to have her Appeal with the Board heard (in fact, it is still pending), as it has been repeatedly delayed.

84.     This is because the Weehawken Co-Conspirator Defendants and the Engineer Co-Conspirator Defendants, faced with the prospect of having their baseless vacate and demolition

17

orders reviewed by a third-party, served Singh with a "Complaint – Notice of Hearing," dated September 21, 2021, setting forth purported ridiculous violations on Singh's property and scheduling a hearing before the Weehawken Township Council on October 13, 2021 to purportedly address Plaintiffs' objections to/appeal of the orders – before the Board could hear Singh's Appeal.  Unsurprisingly, the complaining witness on the document was Tattoli and copied to Mayor Turner, Ahmad, and Venino, all of the same actors who had participated in the harassment and violation of Plaintiffs' constitutional rights.

85.     Then, knowing that they had zero basis for the Vacate and Demolition Orders, and in an effort to save face and provide further (post hac and ridiculous) "basis" to bulldoze Singh's home, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants made numerous false written allegations (which they had no qualifications to make) regarding the cosmetic state of Singh's property, including that Singh was somehow committing economic waste and now somehow constituted a Nuisance Property (and hurting property values of other properties on the same street) because there was some debris and weeds that were growing on her property!

86.     Aside from the preposterous allegations of the property's purported disrepair, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants did not bother to provide any prior citations as to those purported issues prior to filing the Complaint, as the Township would normally do.

87.     After receiving the Complaint, Singh again requested copies of the Engineer Co-Conspirator Defendants engineer reports supporting the Vacate Orders and Demolition Orders. And again, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants provided none.

88.     As such, with no other recourse, Singh was forced to appear at the October 13, 2021 meeting – otherwise, her home and adjoining property would be demolished by the Township.

89.     Tattoli, Venino, Ahmad, and Mayor Turner were all present at the meeting.

90.     At the meeting, Singh's engineer testified and explained that the purported "new" and dangerous cracks allegedly viewed by Tattoli and the Engineer Co-Conspirator Defendants from afar were not new and did not present any danger of collapse.

91.     In support thereof, Singh's engineer explained that he had previously inspected both 2 Lincoln Place and 4 Lincoln Place years prior, and both properties were in the same state – including the cracks on 2 Lincoln.

92.     In response, Tattoli, who could not refute Singh's engineer's testimony, simply testified under oath that he relied on the Engineer Co-Conspirator Defendants who had concluded otherwise – that the cracks were new and presented an imminent danger of collapse.

93.     However, Tattoli admitted that he and the Engineer Co-Conspirator Defendants had not actually inspected the properties, but had only viewed them from a distance.  In fact, Tattoli testified that he had relied on several drone videos taken by the town over Singh's property as his sole basis to demonstrate the cracks enlarged over several days.

94.     However, Tattoli also admitted that he did not know the extent of the cracks (e.g. how far into the building they extended) or how long the cracks had existed.

95.     Notwithstanding this admitted lack of critical information, Tattoli testified that he and the Engineer Co-Conspirator Defendants nonetheless concluded that such cracks were somehow made larger by Hurricane Ida's storm.  But, when pressed on what specific information the engineers had relied on to come to this conclusion, Tattoli deflected and repeatedly responded that those questions would have to be answered by the Engineer Co-Conspirator Defendants, who

were present at the meeting and – one would naturally assume – were going to testify as to their findings.

96.     However, despite Tattoli's repeated responses that the Engineer Co-Conspirator Defendants would confirm everything, neither engineer actually testified as to their purported findings or what they may or may not have told Tattoli as respects to the cracks and the need to issue the vacate and demolition orders.  Why?  Because after reviewing Singh's engineer's report and hearing his testimony, the Engineer Co-Conspirator Defendants did not want to testify under oath and opine that viewing some cracks from a distance required either the vacating or the demolition of Singh's home and adjoining property.  Because the testimony would be false.

97.     After realizing that the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants could not provide any valid grounds for the issuance of the orders, Mayor Turner suddenly interjected himself during the meeting and made an astonishing unilateral decision on behalf of the Board, which completely reversed course as to the Vacate and Demolition Orders.

98.     Specifically, Mayor Turner decided (without any new evidence or testimony) that the Township would now perform work on the Palisades Cliffs slope (below Singh's and other properties) and that Singh and her tenants could immediately return to their homes ***without making any repairs to the properties*** – the same properties that the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had declared should be vacated and demolished because they posed an imminent danger of collapse.

99.     As noted above, the Township had moved immediately to repair the other areas of mudslides in Weehawken.   Since they had done nothing to repair the area below Singh's properties, Mayor Turner stated that the Township would repair and strengthen the retaining wall

after the meeting and that work would commence quickly to reinforce the retaining wall on Singh's property.  However, nothing has been done to date.  In fact, no measures were taken at all to stabilize the retaining wall or slope even though the town wanted to demolish the properties due to the alleged immediate threat of harm.

100.     After the hearing was concluded, Plaintiffs made no repairs to either property, nor did they make any repairs to any part of the Palisades Cliffs (where the mudslide had occurred).

101.     However, although the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had found that the properties were so dangerous that they needed to be immediately demolished, Singh and her tenants were now allowed to return to their homes.

102.     While Singh's tenants returned immediately, Singh did not (and only did so much later), as she was fearful for her safety and of further harassment.

103.     Despite Mayor Turner's order that Singh and her tenants could now return to what had been previously represented by the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants were properties that were so dangerous they needed to be demolished immediately, Singh's Appeal to the Hudson County Board of Appeals remained pending.

104.     In an effort to resolve that Appeal—since the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants had conceded that the orders had no valid basis by allowing Singh and her tenants to return to the properties without any repairs having been completed—Singh, via her attorney, provided the Weehawken Co-Conspirator Defendants with a proposed Stipulation dismissing the Appeal as moot in early February 2022.

105.     The Weehawken Co-Conspirator Defendants did not send any comments to the language of the Stipulation, nor did they sign the Stipulation.

106.     As a result, the Appeal remained pending.

107.     On February 9, 2022, Plaintiffs filed a letter in the First Lawsuit informing the Court of the above events since Hurricane Ida and indicating that Plaintiffs intended to assert these new egregious violations of Singh's constitutional rights.

108.     Obviously, after receiving notice of the letter, the Weehawken Co-Conspirator Defendants decided to refuse to sign the proposed Stipulation, and instead used Plaintiffs' pending Appeal as leverage to further harass Plaintiffs.

109.     Indeed, on March 8, 2022, after still hearing nothing from the Weehawken Co-Conspirator Defendants, and in an effort to avoid appearing at the now moot Appeal, which had been rescheduled in March 2022, Plaintiffs' attorney again asked that the Weehawken Co-Conspirator Defendants provide comments to the proposed language and/or sign the Stipulation.

110.     On March 8, 2022, Venino, on behalf of the Weehawken Co-Conspirator Defendants, responded and refused to sign the Stipulation on the grounds that Plaintiffs had informed the Court of the prior events.  Specifically, Venino stated:

> The draft you sent is not sufficient from our standpoint, especially given your client's 5 page letter to the Federal judge complaining about the whole IDA incident.  It's going to have to cover a lot more of what actually went on.

111.     To date, the Stipulation had not been signed and the Appeal remains pending – this, even though Singh and her tenants have been allowed to return to their homes, which homes are technically still subject to existing Vacate and Demolition Orders that the Weehawken Co-Conspirator Defendants have refused to vacate for no valid reason.

112.     In addition, as a result of the baseless orders, the values of both 2 Lincoln and 4 Lincoln have naturally been drastically reduced.

113.     Indeed, it goes without saying that any property that is subject to a demolition order has little to no value.

114. For example, as a result of the baseless Vacate and Demolition Orders, Plaintiffs cannot sell the properties, they cannot refinance the properties; they can do nothing with their properties; Plaintiffs have lost the economic value and benefit of the properties..

115. In short, via their actions, the Weehawken Co-Conspirator Defendants have unlawfully taken control of Plaintiffs' properties, including Singh's home.

116. And, even if the RICO Co-Conspirator Defendants eventually decide to vacate the orders, the fact that the orders had been entered at all will significantly reduce the marketability of the properties.

117. Additionally, the Weehawken Co-Conspirator Defendants and Engineer Co-Conspirator Defendants are fully aware that ordering the properties to be vacated and demolished would require Plaintiffs to report those orders to their insurance carriers for those properties. In fact, after Singh was forced to do so, the insurance policies were canceled. Since the properties had become uninsurable, Singh would have been left with no insurance proceeds to in the event of a catastrophe (such as a fire or otherwise).

118. Although the policies have since been reinstated, it was only after (i) Plaintiffs had to spend considerable time and expense in providing information from their engineer demonstrating that the Orders were utterly baseless, and (ii) the insurance carrier's own engineer inspected 4 Lincoln Place and concluded that there was nothing that would merit the issuance of the Orders.

119. As a result of the Weehawken Co-Conspirator Defendants' and Engineer Co-Conspirator Defendants' coordinated pattern of harassment, intimidation, retaliation, extortion, and egregious abuse of power, under color of law, Plaintiffs have suffered monetary and other damages. Among other things, Singh (i) was kicked out of her home and threatened with the

demolition of the same without any valid basis, (ii) has seen her properties effectively become controlled by the Weehawken Co-Conspirator Defendants as a result of their deliberate failure to vacate the orders, and (iii) has lost the economic value of her properties.  Finally, Plaintiffs have additionally suffered extreme mental anguish as a result of the Weehawken Co-Conspirator Defendants' and  Engineer Co-Conspirator Defendants' wrongful conduct.

**COUNT ONE**
**FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUION**
**TAKINGS CLAUSE**
**(42 U.S.C. § 1983)**
**<u>(Against Weehawken and the Weehawken Co-Conspirator Defendants)</u>**

120.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

121.    The Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution provides ". . . nor shall private property be taken for public use, without just compensation."

122.    The actions of Defendants as aforesaid fail to substantially advance any legitimate purpose and have the effect of depriving Plaintiffs of the beneficial use of their properties, in violation of Plaintiffs' constitutional rights as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

123.    As a result of Defendants' actions as aforesaid, practical and feasible use of Plaintiffs' properties and rights has been denied.

124.    The actions of Defendants as aforesaid have the effect of regulating Plaintiffs' properties, without compensation having been paid, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

**COUNT TWO**
**DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Co-Conspirator Defendants in their Individual Capacities)**

125.   Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

126.   Plaintiffs have the right to substantive due process, guaranteed under the Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected property interests and liberties and to be free from the deliberate and arbitrary abuse of government power.

127.   The Weehawken Co-Conspirator Defendants have arbitrarily and capriciously interfered with Plaintiffs' constitutionally protected property interests and right to operate a business and engage in the livelihood of Plaintiffs' choice.  The Weehawken Co-Conspirator Defendants have also engaged in a deliberate and arbitrary abuse of government power with no rational or legitimate basis.

128.   The Weehawken Co-Conspirator Defendants' conduct set forth above was part of an ongoing campaign of harassment, intimidation, and retaliation to deprive Plaintiffs of their property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution, specifically, among other things, their right to be free to pursue an occupation without undue government interference, and their right to utilize their properties.

129.   Furthermore, the Weehawken Co-Conspirator Defendants' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

130.   The Weehawken Co-Conspirator Defendants, acting under color of law,

deliberately, unreasonably, arbitrarily and capriciously, without regard to due process, (i) issued an order, with no valid basis, kicking Singh out of her personal residence with little to no prior notice and with only limited personal belongings, (ii) issued an order, with no valid basis, kicking Plaintiffs' tenants out of 4 Lincoln Place, thereby causing Plaintiffs to lose the benefit of rental income for that property, (iii) issued an order with no valid basis, directing Singh's home and 4 Lincoln Place to be immediately demolished, (iv) improperly imposed upon Plaintiffs the burden to demonstrate that the orders were baseless, (v) refused to vacate the Vacate Orders and Demolition Orders, despite conceding they were improper, and (vi) retaliated against Singh by refusing to enter into a Stipulation dismissing Singh's Appeal to the Hudson County Construction Board of Appeals.

131.    In doing all of these things, the Weehawken Co-Conspirator Defendants knew, or should have known, that they were violating Plaintiffs' established constitutional rights to substantive due process, and it was not objectively reasonable for the Weehawken Co-Conspirator Defendants to believe that their conduct did not violate Plaintiffs' established constitutional rights to substantive due process.

132.    The Weehawken Co-Conspirator Defendants' conduct set forth above constitutes a deliberate, egregious and arbitrary abuse of government power that shocks the conscience.

133.    As such, by the aforementioned conduct, the Weehawken Co-Conspirator Defendants denied and continue to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

134.    As a direct and proximate result of the Weehawken Co-Conspirator Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.   In addition, the Weehawken Co-Conspirator

Defendants' actions as alleged herein were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT THREE**
**DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against Weehawken)**

135.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

136.    Mayor Turner, Tattoli, Ahmad, and Venino, as the Mayor of Weehawken, the Construction Official of Weehawken, the Assistant Township Manager of Weehawken, and the Law Director of Weehawken, respectively, are individuals who have final policymaking authority with regard to the management and operation of Weehawken, including the Building Department and Public Works Department, rendering their conduct acts of official government policy of Weehawken.

137.    Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino, has persistently ratified the deprivation of substantive due process set forth above.

138.    In addition, despite having knowledge of the Weehawken Co-Conspirator Defendants' repeated unlawful conduct, Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino, intentionally and knowingly failed to take affirmative action to stop such unlawful conduct.  Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino, also intentionally and knowingly failed to supervise, control and/or discipline the Weehawken Co-Conspirator Defendants' who engaged in the unlawful conduct in the performance of their official duties.

139.    In addition, Mayor Turner, Tattoli, Ahmad, and Venino have affirmatively participated in and directed the unconstitutional conduct set forth above.

140.     As such, by the aforementioned conduct, Weehawken denied and continues to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

141.     As a direct and proximate result of Weehawken's unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.

**COUNT FOUR**
**DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Co-Conspirator Defendants in their Individual Capacities)**

142.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

143.     Plaintiffs have the right to procedural due process, guaranteed under the Fourteenth Amendment of the United States Constitution.

144.     The Weehawken Co-Conspirator Defendants have arbitrarily and capriciously interfered with Plaintiffs' constitutionally protected right to procedural due process by depriving Plaintiffs of their liberty and property interests without one of the fundamental elements of procedural due process, *i.e.* the opportunity to be heard.

145.     Furthermore, the Weehawken Co-Conspirator Defendants' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

146.     The Weehawken Co-Conspirator Defendants, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously refused to enter into a Stipulation resolving the Appeals of the Vacate and Demolition Orders.

147.     The Weehawken Co-Conspirator Defendants then deliberately acted to prevent and impede Plaintiffs from seeking relief from the Vacate and Demolition Orders via the established appeal process with the Hudson County Construction Board of Appeals.

148.     As a result of the Weehawken Co-Conspirator Defendants' deliberate, unreasonable, arbitrary and capricious conduct, Plaintiffs were denied the opportunity to have their Appeal heard by the Hudson County Construction Board of Appeals.

149.     By deliberately, unreasonably, arbitrarily and capriciously engaging in the aforementioned conduct, the Weehawken Co-Conspirator Defendants knew, or should have known, that they were violating Plaintiffs' established constitutional rights by denying Plaintiffs one of the fundamental elements of procedural due process, and it was not objectively reasonable for the Weehawken Co-Conspirator Defendants to believe that their conduct did not violate Plaintiffs' established constitutional rights to procedural due process.

150.     The Weehawken Co-Conspirator Defendants' conduct was random and unauthorized and had no legitimate or rational basis.

151.     As such, by the aforementioned conduct, the Weehawken Co-Conspirator Defendants denied and continue to deny, Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

152.     As a direct and proximate result of the Weehawken Co-Conspirator Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.   In addition, the Weehawken Co-Conspirator Defendants' actions as alleged herein were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT FIVE**
**DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against Weehawken)**

153.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

154.    Mayor Turner, Tattoli, Ahmad, and Venino, as Mayor of Weehawken, the Construction Official of Weehawken, the Assistant Township Manager of Weehawken, and the Law Director of Weehawken, respectively, are individuals who have final policymaking authority with regard to the management and operation of Weehawken, including the Building Department and Public Works Department, rendering their conduct acts of official government policy of Weehawken.

155.    Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino, has persistently ratified the deprivation of procedural due process set forth above.

156.    In addition, despite having knowledge of the Weehawken Co-Conspirator Defendants' repeated unlawful conduct, Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino intentionally and knowingly failed to take affirmative action to stop such unlawful conduct.  Weehawken, through Mayor Turner, Tattoli, Ahmad, and Venino, also intentionally and knowingly failed to supervise, control and/or discipline the Weehawken Co-Conspirator Defendants who engaged in the unlawful conduct in the performance of their official duties.

157.    In addition, Mayor Turner, Tattoli, Ahmad, and Venino have affirmatively participated in and directed the unconstitutional conduct set forth above.

158.     As such, by the aforementioned conduct, Weehawken denied and continues to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

159.     As a direct and proximate result of Weehawken's unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.

**COUNT SIX**
**CONSPIRACY TO DEPRIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Co-Conspirator Defendants in their Individual Capacities)**

160.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

161.     Since 2021 and continuing through today, the Weehawken Co-Conspirator Defendants agreed to, and in fact conspired to, engage in a collective campaign of harassment and intimidation to deprive Plaintiffs of their property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution, to retaliate against Singh, to kick Singh out of her property and threaten to demolish that property with no basis, and to refuse to vacate the Vacate and Demolition Orders for Singh's home and 4 Lincoln Place.

162.     The Weehawken Co-Conspirator Defendants also agreed to, and in fact conspired, to continue to engage in a collective campaign of harassment and intimidation to deprive Plaintiffs of their property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution.

163.     As set forth above, the Weehawken Co-Conspirator Defendants' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

164.     The Weehawken Co-Conspirator Defendants, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously issued two baseless vacate and demolition Orders, kicked Singh out of her residence, and kicked Plaintiffs' tenants out of their residences, causing Plaintiffs to lose the benefit of rental income.

165.     The Weehawken Co-Conspirator Defendants, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously refused to vacate the Vacate and Demolition Orders for Singh's home and 4 Lincoln Place.

166.     The Weehawken Co-Conspirator Defendants, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously refused to execute the Stipulation and to allow Plaintiffs' Appeal to be heard.

167.     In doing these things, the Weehawken Co-Conspirator Defendants knew, or should have known, that they were violating Plaintiffs' established constitutional rights, and it was not objectively reasonable for the Weehawken Co-Conspirator Defendants to believe that their conduct did not violate Plaintiffs' established constitutional rights.

168.     The Weehawken Co-Conspirator Defendants' conduct set forth herein constitutes such egregious abuse of power that it shocks the conscience.

169.     As such, by the aforementioned conduct, the Weehawken Co-Conspirator Defendants, in concert with each other, denied and continue to deny, Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

170.     As a direct and proximate result of the Weehawken Co-Conspirator Defendants' unlawful conduct described above, Plaintiffs suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Co-Conspirator Defendants' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT SEVEN**
**DEPRIVATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) (Against the Weehawken Co-Conspirator Defendants in their Individual Capacities)**

171.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

172.     Plaintiffs have the right to equal protection of the law, guaranteed by the Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected liberty and property interests.

173.     The Weehawken Co-Conspirator Defendants, acting under the color of New Jersey law, deliberately and willfully infringed upon Plaintiffs' constitutional rights to equal protection under the Fourteenth Amendment of the United States Constitution.

174.     The Weehawken Co-Conspirator Defendants intentionally targeted Plaintiffs, treating them differently from other similarly situated owners of property neighboring Plaintiffs' properties by singling out Plaintiffs by (i) issuing orders directing Singh and her tenants to vacate their homes, (ii) issuing orders directing the demolition of Singh's home and 4 Lincoln Place, and (iii) refusing to vacate the Vacate and Demolition Orders, despite allowing Singh and her tenants to return to their homes, in a deliberate, unjustifiable, arbitrary and discriminatory manner, in an attempt to unlawfully limit, interfere with and otherwise deprive Plaintiffs of their constitutionally protected liberty and property interests.

175.   Indeed, the Weehawken Co-Conspirator Defendants favored similarly situated owners of property adjacent to and surrounding 2 Lincoln Place and 4 Lincoln Place in a deliberate, unjustifiable, arbitrary and discriminatory manner by refraining from issuing vacate and demolition orders for those properties, when those properties were similarly situated near mud/landslides.

176.   The Weehawken Co-Conspirator Defendants had no reasonable, rational or legitimate basis for such disparate treatment.  Rather, the Weehawken Co-Conspirator Defendants' conduct was intentional, willful and malicious and was motivated by Weehawken Co-Conspirator Defendants' intent to discriminate against Plaintiffs and to punish and/or inhibit Plaintiffs' exercise of their constitutional rights.

177.   By the aforementioned conduct, the Weehawken Co-Conspirator Defendants denied Plaintiffs their rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the Unites States in violation of 42 U.S.C. § 1983.

178.   As a result of the Weehawken Co-Conspirator Defendants' unlawful conduct described above, Plaintiffs have been damaged.  In addition, the Weehawken Co-Conspirator Defendants' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT EIGHT**
**VIOLATION OF NEW JERSEY CIVIL RIGHTS ACT**
**(N.J.S.A. § 10:6-2(c))**
**(Against Weehawken and the Weehawken Co-Conspirator Defendants in their Individual**
**Capacities)**

179.   Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

180.   By the aforementioned conduct, Weehawken and Weehawken Co-Conspirator

Defendants violated and continue to violate Plaintiffs' due process and equal protection rights guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, Paragraph 1 of the New Jersey Constitution.

181.    As a result of Weehawken's and the Weehawken Co-Conspirator Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.   In addition, the Weehawken Co-Conspirator Defendants' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT NINE**
**VIOLATION OF FEDERAL RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C.  §  1962(c))**
**(Against the Weehawken Co-Conspirator Defendants in their Individual Capacities and**
**the Engineer Co-Conspirator Defendants)**

182.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

183.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN are "persons" within the meaning of 18 U.S.C. § 1961(3).

184.    Weehawken is an "enterprise" which engaged in, and continues to engage in, and which activities affected, and continue to affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

185.    In the alternative, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN, acting together and in concert with each other, were and are an association-in-fact, which function together as a continuing unit with an ascertainable structure separate and distinct from the "pattern of racketeering activity" alleged herein, and which therefore constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

186.    The association-in-fact enterprise consisting of Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN engaged in, and continues to engage in, and its activities affected, and continue to affect, interstate or foreign commerce.

187.    Beginning in 2021, and continuing through the present, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN were employed by and/or associated with the enterprise, to conduct or participate, directly or indirectly, in the conduct of the enterprise through a pattern of racketeering activity.

188.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN formed a scheme or artifice to harass, intimidate, retaliate against, and extort Plaintiffs in connection with having filed, testified, and intending to testify at trial in the First Lawsuit and to force Plaintiffs to continue to provide essentially free housing for the Politically Favored Individuals.  This scheme was also aimed at causing sufficient financial and emotional harm to Plaintiffs so as to force them out of Weehawken permanently.

189.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN carried out the scheme or artifice to harass, intimidate, retaliate against, and extort Plaintiffs by, *inter alia*:

(a)    issuing improper and baseless Vacate Orders and Demolition Orders for Singh's residence at 2 Lincoln and adjoining property at 4 Lincoln;

(b)    kicking Singh out of her personal residence;

(c)    kicking Lincoln at Gregory LLC's tenants out of their personal residence, resulting in a loss of rental income;

(d)    breaking and entering into Plaintiffs' properties and unlawfully confronting Plaintiffs inside their private properties;

(e)    impeding Singh's ability to have her Appeal heard; and

36

(f)     refusing to vacate the Vacate Orders and Demolition Orders despite acknowledging that they were improper, thus taking control over Plaintiffs' properties and rendering practically worthless and attempting to run Plaintiffs out of town.

190.    The foregoing acts by Mayor Turner, Tattoli, Ahmad, and Venino were committed willfully.

191.    By the forgoing acts, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN attempted to and, in fact, did obtain and interfere with Plaintiffs' (i) ability to prosecute its First Lawsuit and (ii) rights to the ownership and use of their properties, including, but not limited to, unlawfully interfering with Plaintiffs' right to the use and enjoyment of their private property without unlawful governmental interference, the right to pursue a lawful business, the right to make business decisions free from outside pressure (*i.e.* free from harassment, intimidation and retaliation from individuals under color of official right), and the right to engage in commerce and to receive profits from lost rents.

192.    The foregoing acts by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN involve (i) extortion as defined under 18 U.S.C. § 1951(b)(2), (ii) tampering with a witness as defined under 18 U.S.C. § 1512((b), (c), and (d) and, (iii) retaliating against a witness or victim as defined under 18 U.S.C. § 1513(b), which are crimes chargeable and punishable by imprisonment for more than one year.

193.    The foregoing acts by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN constitute illegal acts defined as predicate acts of racketeering activity under and 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(1)(B).

194.    The foregoing predicate acts were undertaken by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN repeatedly and continuously over the course of almost two years, from 2021 to the present.

195.     The foregoing related and continuous predicate acts constitute a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

196.     As set forth above, for approximately two and a half years, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN acted in concert to knowingly, intentionally and willfully conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise consisting of Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN and played a direct, knowing and willful role in the management and operation of that enterprise in connection with or through the pattern of racketeering activity set forth above in violation of 18 U.S.C. § 1962(c).

197.     As a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been damaged within the meaning of 18 U.S.C. § 1964(c).

## COUNT TEN
## CONSPIRACY TO VIOLATE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(d))
## (Against the Weehawken Co-Conspirator Defendants in their Individual Capacities and the Engineer Co-Conspirator Defendants)

198.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

199.     Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN knowingly agreed with one another to enter into and facilitate a conspiracy to violate the provisions of 18 U.S.C. § 1962(c) as set forth above.

200.     At all relevant times, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN knowingly and intentionally agreed and conspired with each other to commit or to assist in the commission of at least two of the predicate acts set forth above, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of

38

racketeering activity in that, among other things, such predicate acts were designed to harass, intimidate, retaliate against, and extort Plaintiffs in connection with having filed, testified, and intending to testify at trial in the First Lawsuit and to force Plaintiffs to continue to provide essentially free housing for the Politically Favored Individuals.  This scheme was also aimed at causing sufficient financial and emotional harm to Plaintiffs so as to force them out of Weehawken permanently.

201.    In furtherance of their conspiracy to violate 18 U.S.C. § 1962(c), Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN engaged in the above-described pattern of racketeering activity and, by their direct, knowing and willful management and operation of the enterprise, in connection with or through the pattern of racketeering activity, each of them conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise.

202.    As a direct and proximate result of the foregoing conspiracy in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), Plaintiffs have been damaged within the meaning of 18 U.S.C. § 1964(c).

## COUNT ELEVEN
## VIOLATION OF NEW JERSEY RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (N.J.S.A.  §  2C:41-2(c))
### (Against the Weehawken Co-Conspirator Defendants in their Individual Capacities and the Engineer Co-Conspirator Defendants)

203.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

204.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN are "persons" within the meaning of N.J.S.A. § 2C:41-1(b).

205.    Weehawken is an "enterprise" which engaged in, and continues to engage in, and

which activities affected, and continue to affect, interstate or foreign commerce, within the meaning of N.J.S.A. § 2C:41-1(c).

206.    In the alternative, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN, acting together and in concert with each other, were and are an association-in-fact, which function together as a continuing unit with an ascertainable structure separate and distinct from the "pattern of racketeering activity" alleged herein, and which therefore constitutes an "enterprise" within the meaning of N.J.S.A. § 2C:41-1(c).

207.    The association-in-fact enterprise consisting of Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN engaged in, and continues to engage in, and its activities affected, and continue to affect, interstate or foreign commerce.

208.    Beginning in 2021, and continuing through the present, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN were employed by and/or associated with the enterprise, to conduct or participate, directly or indirectly, in the conduct of the enterprise through a pattern of racketeering activity.

209.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN formed a scheme or artifice to harass, intimidate, retaliate against, and extort Plaintiffs in connection with having filed, testified, and intending to testify at trial in the First Lawsuit and to force Plaintiffs to continue to provide essentially free housing for the Politically Favored Individuals.  This scheme was also aimed at causing sufficient financial and emotional harm to Plaintiffs so as to force them out of Weehawken permanently.

210.    Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN carried out the scheme or artifice to harass, intimidate, retaliate against, and extort Plaintiffs by, *inter alia*:

40

(a)    issuing improper and baseless Vacate Orders and Demolition Orders for Singh's residence at 2 Lincoln and adjoining property at 4 Lincoln;

(b)    kicking Singh out of her personal residence;

(c)    kicking Lincoln at Gregory LLC's tenants out of their personal residence;

(d)    breaking and entering into Plaintiffs' properties and unlawfully confronting Plaintiffs inside their private properties;

(e)    impeding Singh's ability to have her Appeal heard; and

(f)    refusing to vacate the Vacate Orders and Demolition Orders despite acknowledging that they were improper, thus taking control over Plaintiffs' properties and rendering practically worthless and attempting to run Plaintiffs out of town.

211.    The foregoing acts by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN were committed willfully.

212.    By the forgoing acts, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN attempted to and, in fact, did obtain and interfere with Plaintiffs' (i) ability to prosecute its First Lawsuit and (ii) rights to the ownership and use of their properties, including, but not limited to, unlawfully interfering with Plaintiffs' right to the use and enjoyment of their private property without unlawful governmental interference, the right to pursue a lawful business, the right to make business decisions free from outside pressure (*i.e.* free from harassment, intimidation and retaliation from individuals under color of official right), and the right to engage in commerce and to receive profits from lost rents.

213.    The foregoing acts by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN involve extortion as defined under N.J.S.A. § 2C:20-5(d), (ii) tampering with a witness as defined under 18 U.S.C. § 1512((b), (c), and (d) and, (iii) retaliating against a witness or victim as defined under 18 U.S.C. § 1513(b), and, which are crimes chargeable and punishable by imprisonment for more than one year.

214.     The foregoing acts by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN constitute illegal acts defined as predicate acts of racketeering activity under N.J.S.A. § 2C:41-1(a)(1)(h), N.J.S.A. § 2C:41-1(a)(1)(n), and N.J.S.A. § 2C:41-1(a)(2).

215.     The foregoing predicate acts were undertaken by Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN repeatedly and continuously over the course of approximately two and a half years, from 2021 to the present.

216.     The foregoing related and continuous predicate acts constitute a pattern of racketeering activity as defined by N.J.S.A. § 2C:41-1(d).

217.     As set forth above, for approximately two and a half years, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN acted in concert to knowingly, intentionally and willfully conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise and played a direct, knowing and willful role in the management and operation of that enterprise in connection with or through the pattern of racketeering activity set forth above in violation of N.J.S.A. § 2C:41-2(c).

218.     As a direct and proximate result of the foregoing violation of N.J.S.A. § 2C:41-2(c), Plaintiffs have been damaged within the meaning of N.J.S.A. § 2C:41-4(c).

**COUNT TWELVE**
**CONSPIRACY TO VIOLATE NEW JERSEY RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(N.J.S.A. § 2C:41-2(d))**
**(Against the Weehawken Co-Conspirator Defendants in their Individual Capacities and the Engineer Co-Conspirator Defendants)**

219.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

220.     Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN knowingly agreed with one another to enter into and facilitate a conspiracy to violate the

42

provisions of N.J.S.A. § 2C:41-2(c) as set forth above.

221.    At all relevant times, Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN knowingly and intentionally agreed and conspired with each other to commit or to assist in the commission of at least two of the predicate acts set forth above, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering activity in that, among other things, such predicate acts were designed to harass, intimidate, retaliate against, and extort Plaintiffs in connection with having filed, testified, and intending to testify at trial in the First Lawsuit and to force Plaintiffs to continue to provide essentially free housing for the Politically Favored Individuals. This scheme was also aimed at causing sufficient financial and emotional harm to Plaintiffs so as to force them out of Weehawken permanently.

222.    In furtherance of their conspiracy to violate N.J.S.A. § 2C:41-2(c), Mayor Turner, Tattoli, Ahmad, Venino, Venezia, Colliers Engineering, Jundi, and JZN engaged in the above-described pattern of racketeering activity and, by their direct, knowing and willful management and operation of their enterprise, in connection with or through the pattern of racketeering activity, each of them conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise.

223.    As a direct and proximate result of the foregoing conspiracy in violation of N.J.S.A. § 2C:41-2(d), to violate N.J.S.A. § 2C:41-2(c), Plaintiffs have been damaged within the meaning of N.J.S.A. § 2C:41-4(c).

**COUNT THIRTEEN**
**NEGLIGENCE**
**(Against the Engineer Co-Conspirator Defendants)**

224.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs

as if set forth at length herein.

225.     The Engineer Co-Conspirator Defendants had a duty of care to exercise ordinary and reasonable care in performing their inspection of Plaintiffs' properties and in preparing their reports setting forth their findings.

226.     Through the afore-described conduct, the Engineer Co-Conspirator Defendants breached that duty.

227.     As a direct and proximate result of the breach by the Engineer Co-Conspirator Defendants of their duty to exercise ordinary and reasonable care, Plaintiffs have suffered and continue to suffer damages.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment against Defendants:

a.     awarding compensatory, exemplary, and punitive damages in the amount of $50 million;

b.     awarding treble damages, pursuant to 18 U.S.C. § 1964(c), and N.J.S.A. § 2C:41-4(c);

c.     awarding attorneys' fees, pursuant to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), N.J.S.A. § 10:6-2(f) and N.J.S.A. § 2C:41-4(c); and

d.     awarding such other and further relief as the Court may deem just and proper either in law or in equity.

## DEMAND FOR TRIAL BY JURY

Plaintiffs request a trial by jury on all issues so triable.

Dated: August 28, 2023

**KRANJAC TRIPODI & PARTNERS LLP**

By: <u>s/ Xavier M. Bailliard</u>
    Xavier M. Bailliard
    30 Wall Street, 12th Floor
    New York, NY 10005
    Tel: (646) 216-2400
    Fax: (646) 216-2373
    xbailliard@ktpllp.com

*Attorneys for Plaintiffs*

45